# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 13, 2020

Lyle W. Cayce
Clerk

No. 19-20800

RAVAGO AMERICAS L.L.C.,

*Plaintiff,*

*versus*

VINMAR INTERNATIONAL LIMITED,

*Defendant,*

_____

RAVAGO AMERICAS L.L.C.,

*Plaintiff—Appellee,*

*versus*

KIRT DMYTRUK,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-36
USDC No. 4:19-CV-2691

Before KING, STEWART, and SOUTHWICK, *Circuit Judges.*

No. 19-20800

Per Curiam:*

Following what the presiding judge described as a civil enforcement hearing, Kirt Dmytruk was found to have violated an injunction. The judge ordered that Dmytruk pay Ravago Americas L.L.C. $50,000 plus attorneys' fees and imposed an additional recordkeeping requirement, along with a three-month extension of the injunction. Dmytruk appealed, arguing that the district court's contempt findings are unsupported by the record and the contempt order should be reversed in its entirety. We disagree. Even so, Dmytruk contends that, at minimum, the $50,000 sanction, the recordkeeping requirement, and the injunction extension should be vacated. Dmytruk argues these are criminal sanctions, imposed despite the absence of the requisite constitutional protections. Because the recordkeeping requirement and the three-month extension (as modified and extended) have finally expired, Dmytruk's arguments as to these are moot. As to the $50,000 sanction, however, Dmytruk is correct. Accordingly, this appeal is DISMISSED IN PART, and we AFFIRM IN PART and VACATE IN PART the district court's order.

## I.

Defendant–appellant Kirt Dmytruk is a former employee of plaintiff–appellee, Ravago Americas L.L.C. Before leaving Ravago in August 2018, Dmytruk signed a non-solicitation agreement. He promised that, for eighteen months after leaving Ravago, he would not attempt to recruit any of his Ravago colleagues.

Some months later, Ravago sued Dmytruk in federal district court in Connecticut for violations of their agreement. Dmytruk had by then begun

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 19-20800

working for Ravago's competitor, Vinmar International, Ltd., and Ravago alleged Dmytruk was attempting to poach Ravago's employees.

The Connecticut court entered a preliminary injunction that, *inter alia*, enjoined Dmytruk from "[t]aking the initial step to contact, try to contact, or solicit current employees or personnel of Ravago or any of its subsidiaries or related entities to work for Vinmar International, Ltd. or any of its affiliates." The court explained that it added the "initial step" language to Ravago's proposed injunction to protect Dmytruk, in the event that "someone who's an employee of Ravago wants to go searching for a job and they apply."

In April 2019, four Vinmar employees, including Dmytruk, attended an industry trade show. Also at the trade show was Rodrigo Lacayo, a Ravago employee. Although the substance of their interactions is contested, it is undisputed that Dmytruk and Lacayo met at the trade show and that they later met for drinks with two of the other Vinmar employees, Oscar Bedoya and Fernando Lopez. According to Lacayo, over drinks, Dmytruk attempted to recruit him to work at Vinmar. But Dmytruk, Bedoya, and Lopez told a different story. Lacayo testified that he considered the offer for a few days before deciding to remain at Ravago.

Based on these encounters, Ravago filed a motion in the Connecticut district court seeking to have Dmytruk declared a contemnor. This appeal is before us, however, because before the motion was ruled on, the lawsuit was transferred to the Southern District of Texas.

The Texas district court held a hearing on the contempt motion, at which Lacayo and the four Vinmar employees testified. Responding to defense counsel's remarks about the prospect of criminal sanctions, the district court declared: "There will be no criminal at this proceeding. . . . This is a civil enforcement or inspirational hearing. It will be all quite civil."

After the final witness was heard, the district court announced, in relevant part, that it "conclude[d] that the injunction was violated" and ordered Dmytruk to pay "$50,000 plus the attorneys' fees related to this hearing." The district court pointed out apparent inconsistencies in Bedoya's and Lopez's testimonies. The district court concluded that "[Dmytruk] raised the prospect of employment with Vinmar, and that's all it takes."

A written contempt order followed. It stated that "Dmytruk violated the preliminary injunction by contacting Rodrigo Lacayo—a Ravago Americas L.L.C., employee." And it required Dmytruk (1) to "pay Ravago $50,000 for his violation," (2) to "reimburse Ravago for its reasonable attorney fees related to the hearing on the motion for contempt," and (3) to "keep a log of his daily activities, appointment schedules, phone records, and work and personal computer use." The order extended the preliminary injunction "for three months to compensate for this distraction."

Dmytruk appealed and moved this court to stay the contempt order pending appeal. Ravago responded, asserting that this court lacked jurisdiction over the appeal, which this court construed as a motion to dismiss the appeal. A motions panel denied both motions without opinion.

## II.

### A. Jurisdiction

We address jurisdiction first, though our jurisdictional inquiry here is intertwined with the merits. Ravago asks us to dismiss this appeal because it asserts the contempt sanctions at issue are civil penalties. If Ravago is correct—and given that the case in district court is ongoing—we lack jurisdiction. *See Lamar Fin. Corp. v. Adams*, 918 F.2d 564, 566 (5th Cir. 1990) (citing *Drummond Co. v. Dist. 20, United Mine Workers*, 598 F.2d 381 (5th

Cir. 1979)). If, however, we determine the sanctions imposed were criminal, Dmytruk was entitled to take an immediate appeal.

This is so because this court has jurisdiction over "appeals from . . . final decisions of the district courts of the United States." 28 U.S.C. § 1291. And, "[o]rdinarily, civil contempt orders are not viewed as final, appealable orders under 28 U.S.C. § 1291." *Lamar*, 918 F.2d at 566. "Criminal contempt orders, on the other hand, are final and immediately appealable." *Id.* Where an order "contains both a punitive and a coercive dimension," the punitive, or criminal, feature dominates and fixes its character for purposes of review. *Id.* at 567; *see Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 836 (1994) (quoting *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 638 n.10 (1988)); *see also FDIC v. LeGrand*, 43 F.3d 163, 168 (5th Cir. 1995) (Stewart, J.) (citing *Lamar*, 918 F.2d at 567).

For reasons that will become clear below, the $50,000 sanction is best characterized as punitive, fixing the character of the contempt order as criminal for jurisdictional purposes, and giving us the power to entertain this appeal.

B. *Due Process*

    i.   *Criminal v. Civil Contempt*

Dmytruk's ultimate question is whether due procedural protections were employed before the district court imposed the $50,000 sanction. The requisite protections vary based on the nature of the penalty. *See Bagwell*, 512 U.S. at 827 n.2. And so, to address Dmytruk's question, we must first decide whether the $50,000 sanction is best characterized as a civil contempt sanction or a criminal one.

The distinction between the two is elusive, and the varied tests used to make this determination are not easily reconcilable. *See Bagwell*, 512 U.S. at 839-40 (Scalia J., concurring). Although the district court's

characterization of the proceeding is a natural starting point for our inquiry, *see Smith v. Sullivan*, 611 F.2d 1050, 1052 n.7 (5th Cir. 1980), it is not the end. "[C]onclusions about the civil or criminal nature of a contempt sanction are properly drawn . . . 'from an examination of the character of the relief itself.'" *Crowe v. Smith*, 151 F.3d 217, 227 (5th Cir. 1998) (quoting *Bagwell*, 512 U.S. at 828).

Criminal sanctions are designed to vindicate the authority of the court. *Ingalls v. Thompson (In re Bradley)*, 588 F.3d 254, 263 (5th Cir. 2009). They are punitive and typically punish a contemnor for past disobedience. *Id.* By contrast, civil sanctions can either be compensatory or coercive. To be compensatory, they must remedy losses sustained. *Id.* Where coercive, civil sanctions are designed to pressure the contemnor into compliance with a court order. *Id.*

Distinguishing between civil and criminal sanctions by looking to the character of the relief, however, does not always yield clear answers. This is so because even where punishment is purely compensatory, there is also vindication of the court's authority. And where the punishment is solely punitive, there may be incidental benefit to the complainant, as such punishment may well deter future disobedience. *See Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 443 (1911).

Because the character of the relief is not always easy to ascertain, it is best considered in the context of the extraordinary means of enforcement employed. "That one and the same person should be able to make the rule, to adjudicate its violation, and to assess its penalty is out of accord with our usual notions of fairness and separation of powers." *Bagwell*, 512 U.S. at 840 (Scalia J., concurring). As an injunction's commands become more complex, contempts involving out-of-court disobedience may require elaborate and reliable factfinding. *Bagwell*, 512 U.S. at 833-34. A "hearing must be held,

witnesses must be called, and evidence taken in any event. And often . . . crucial facts are in close dispute." *Id.* at 834 (quoting *Green v. United States*, 356 U.S. 165, 217 n.33 (1958) (Black, J., dissenting)). Under these circumstances, in light of the extraordinary means of enforcement at play, criminal procedural protections may be both necessary and appropriate. *Id.* at 834.

As Ravago highlights, there are some facts before us that indicate the $50,000 sanction was intended as a civil penalty. The presiding judge did, after all, note that "there would be no criminal at [the] proceeding." "It will be all quite civil," he remarked. Further, the district court ordered the $50,000 be paid directly to Ravago, as opposed to the court itself. *See Feiock*, 485 U.S. at 632 (describing fines as compensatory when paid to the complainant and punitive when paid to the court). At first blush, then, the $50,000 sanction appears to be compensatory.

But we cannot overlook the fact that for a sanction to be compensatory, it must be "measured in some degree by the pecuniary injury caused by the act of disobedience." *Gompers*, 221 U.S. at 444. The district court announced Dmytruk was to pay $50,000 without explaining how this amount relates to any loss Ravago sustained. After all, Rodrigo Lacayo, the employee at the center of the dispute, still works for Ravago. Ravago argues that the cost of the violation, though not easily ascertainable, is real. Ravago notes the violation caused it to "consider the means necessary to maintain relationships with its key employees" and "engage in uncomfortable monitoring of [valuable] employees." No evidence of how these activities amounted to a $50,000 expense was proffered during the hearing, nor do any arguments briefed before the district court explain how the $50,000 may have served a remedial, or compensatory, function.

That the $50,000 sanction is not compensatory, however, does not mean it cannot be appropriately characterized as civil. *See, e.g.*, *Ingalls,* 588 F.3d at 263 (explaining that civil fines may be compensatory or coercive). The district court indicated the $50,000 sanction was meant to be coercive: "This is coercive," the court remarked, ". . . which doesn't mean that it can't be kind of harsh . . . ." And, indeed, as the court granted a three-month extension of the injunction, the penalty may well have had a coercive effect. The cost could have deterred Dmytruk from disobeying the prohibitions still in place.

The penalty's coercive effect, though, is merely incidental. In other words, "[w]here a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." *Bagwell*, 512 U.S. at 829. "[A] 'flat, unconditional fine' totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." *Id.* (quoting *Penfield Co. of Cal. v. SEC*, 330 U.S. 585, 588 (1947)); *see also Ingalls*, 588 F.3d at 263 ("[A] lump sum fine that punishes past conduct is criminal, while a fine that accrues on an ongoing basis in response to noncompliance is civil."). The judge offered no such opportunity to purge the $50,000 sanction. Therefore, the $50,000 sanction, despite its incidental coercive effect, looks more like a flat fine meant to punish Dmytruk for past conduct, and thereby vindicate the court's authority. That is, the $50,000 sanction is best characterized as punitive, or criminal.

If any doubt remains about the proper characterization of the $50,000 sanction, we need only look to the means of enforcement employed. *See Bagwell*, 512 U.S. at 840 (Scalia J., concurring). To decide if the injunction had been violated, the judge presided over a lengthy hearing. Several witnesses testified to conflicting accounts of the relevant events. Critical facts were in close dispute. These circumstances indicate that criminal

procedural protections were likely necessary and appropriate. *Bagwell*, 512 U.S. at 833-34. Having considered all relevant factors, we conclude the $50,000 sanction, unrelated to any evidenced pecuniary injury and imposed without opportunity to purge, is best characterized as a criminal sanction.

### ii.    *Standard of Review*

The parties ask that we take a final detour before resolving the due process question, to address the appropriate standard of review. Ravago asserts that on this record, the district court's actions should be reviewed for plain error. Dmytruk disagrees, urging "the ordinary standard of review to reverse criminal-contempt orders." There is a lack of guidance from binding precedent on this point, and conflicting persuasive authority.[1] The facts of this case, featuring ambiguous objections, do not present the best opportunity to settle this issue. Because we conclude that Dmytruk has demonstrated plain error, we proceed with our analysis assuming (without deciding) that plain-error review applies.

### iii.    *Due Procedural Protections*

We return to the question ultimately at issue. Having established the $50,000 sanction is best characterized as a criminal sanction, were the due procedural protections properly employed? Dmytruk argues that he was entitled to a host of procedural safeguards—none of which was present at his hearing—including notice of potential criminal sanctions, a requirement of

---

[1] *Cf. Viator v. Miller*, 136 F. App'x 615, 616 (5th Cir. 2005) (employing plain-error review), *with United States v. Puente*, 558 F. App'x 338, 341 (5th Cir. 2013) (making no mention of plain-error despite noting that the defendant "did not contemporaneously object to his contempt proceedings").The Fourth Circuit, on the other hand, concluded that plain-error review was proper even though the defendant's "failure to raise a timely objection to the court's summary contempt proceeding is understandable." *United States v. Hernandez (In re Gates)*, 600 F.3d 333, 337 (4th Cir. 2010).

"contumacious intent," a beyond-a-reasonable-doubt standard of guilt, an independent prosecutor, and a jury trial. Ravago responds that the procedural protections listed by Dmytruk are not required in every criminal contempt hearing and are not required here.

A variety of procedural safeguards must be in place before a district court may impose criminal sanctions. *See Bagwell*, 512 U.S. 826-27 (collecting cases). These range from sufficient notice that the proceedings are of a criminal nature to proof of guilt beyond a reasonable doubt, and the involvement of an independent prosecutor. *See Lamar*, 918 F.2d at 567; Fed. R. Crim. P. 42(a)(1) (notice); *see also Crowe*, 151 F.3d at 227-28 (independent prosecutor); *In re Stewart*, 571 F.2d 958, 965 (5th Cir. 1978) (proof beyond a reasonable doubt); *In re Joyce*, 506 F.2d 373, 378 (5th Cir. 1975) (state of mind). "'[S]erious' criminal contempts" trigger "the right to jury trial." *Bagwell*, 512 U.S. at 826-27 (quoting *Bloom v. Illinois*, 391 U.S. 194, 199 (1968)).

It is undisputed that most of these protections were not present at Dmytruk's hearing. And the absence of even one suffices to vacate his criminal sanctions. *See, e.g., Bagwell*, 512 U.S. at 838 (vacating for lack of jury trial); *Crowe*, 151 F.3d at 228-29 (vacating for lack of independent prosecutor); *Lamar*, 918 F.2d at 567 (vacating for lack of notice); *see also LeGrand*, 43 F.3d at 169-70 (vacating for lack of notice and independent prosecutor). Ravago suggests that Dmytruk's criminal sanctions were not "serious," and therefore some or all of these protections were not required.

To be sure, we encounter another elusive distinction between serious and petty fines for contempt, as no dividing line has been precisely drawn, and this distinction has some bearing on the requisite protections. *See Bagwell*, 512 U.S. at 837 n.5; *Crowe*, 151 F.3d at 228 n.13. This court, however, has ruled that a fine of "$75,000 is manifestly non-petty in the case of an

individual," *Crowe*, 151 F.3d at 228 n.13, and has suggested elsewhere that "a petty criminal contempt penalty does not exceed . . . a fine of $5,000." *Fahle v. Cornyn*, 231 F.3d 193, 196 (5th Cir. 2000) (Stewart, J.). Accordingly, Dmytruk's $50,000 sanction was a "serious" criminal contempt penalty, entitling him to the protection of a jury trial, *see Bagwell*, 512 U.S. at 826-27, which he did not receive. The district court examined conduct that took place out of court and relied on the lengthy testimony of witnesses—immediate punishment was not so essential as to merit an exception to the requirements of due process. *See Stewart*, 571 F.2d at 964; *see also* FED. R. CRIM. P. 42(b).

Therefore, the district court plainly erred in imposing the $50,000 sanction without employing proper procedural protections. *See Puckett v. United States*, 556 U.S. 129, 135 (2009); *see, e.g., Crowe*, 151 F.3d at 228 ("[T]he district court committed a clear violation of CNA and Tone's right to due process in this case when it imposed determinative criminal fines on them without affording the benefit of an independent and impartial prosecutor.").

Further, this error "affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it 'affected the outcome of the district court proceedings.'" *Puckett*, 556 U.S. at 135 (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). It would be difficult to conclude that the district court's use of the wrong standard of proof—and failure to submit the facts to a jury—had no effect on the outcome of the proceeding at issue, particularly in light of the conflicting testimony at the hearing. *See United States v. Davila*, 569 U.S. 597, 611 (2013) (structural errors trigger automatic reversal); *see also United States v. Neal*, 101 F.3d 993, 999 (4th Cir. 1996) ("[T]he failure of the district judge to appoint an independent prosecutor to pursue the charge of indirect contempt is an error that affects substantial rights.").

And so, we have "the discretion to remedy the error—discretion which ought to be exercised only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Puckett*, 556 U.S. at 135 (quoting *Olano*, 507 U.S. at 736). We conclude this discretion would be properly exercised here, where the defendant was subjected to criminal contempt sanctions without several procedural protections that the Supreme Court has long held are required. The district court's errors implicate a "bedrock principle[] in our system of justice" and thus "was of the most fundamental kind." *In re Gates*, 600 F.3d at 341. We are compelled to correct them and vacate the $50,000 sanction.

## C. Evidence Supporting the Contempt Order

Having determined we should vacate the criminal portion of the order, we turn to whether the evidence presented was sufficient to support a finding of civil contempt, [2] or whether the civil contempt order, and the associated award of attorneys' fees, should be reversed.

Although we review findings of civil contempt for abuse of discretion, our review is not perfunctory. *Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs., Inc.,* 799 F.3d 437, 452 (5th Cir. 2015) (Southwick, J.). Thus, this court "review[s] the district court's factual findings for clear error and

---

[2] The $50,000 sanction is best characterized as a criminal sanction and, for jurisdictional purposes, fixed the character of the contempt order as criminal. This issue, however, implicates the validity of the entire contempt order, including the award of attorneys' fees—a sanction that Dmytruk concedes is civil. Although the ordered sanctions were mixed, it does not follow that we must vacate and remand the whole proceeding for failure to employ proper procedural safeguards before imposing a criminal sanction. *See LeGrand*, 43 F.3d at 170 (citing *Lamar,* 918 F.2d at 256 (vacating and remanding the criminal portion of the order but affirming the civil portion after finding the district court had not abused its discretion in granting the civil relief)); *Smith v. Smith*, 145 F.3d 335, 337 (5th Cir. 1998) (bifurcating relief).

its legal conclusions de novo." *Sundown Energy, LP v. Haller*, 773 F.3d 606, 615 (5th Cir. 2014).

>    i.    *Scope of the Injunction*

We begin with an analysis of the injunction's language. "[T]he interpretation of the scope of the injunctive order[] is a question of law to be determined by the independent judgment of this [c]ourt." *Hornbeck Offshore Servs., LLC v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013) (quoting *Drummond Co.,* 598 F.2d at 385).

The parties dispute what conduct the injunction actually prohibited. In relevant part, the injunction's terms enjoined Dmytruk from "[t]aking the initial step to contact, try to contact, or solicit current employees or personnel of Ravago . . . to work for Vinmar." Dmytruk argues that the injunction's language means he "was allowed to interact and even discuss employment with Ravago employees so long as he did not initiate the contact." This, in Dmytruk's view, is the only reasonable interpretation of the injunction. Ravago disagrees and argues that the language "prohibits Dmytruk from communicating with any of Ravago's employees about working for Vinmar, unless the Ravago employee broaches the subject first."

At the center of the parties' disagreement is whether the phrase "to work for Vinmar" applies only to "solicit" or applies to "contact" and "try to contact" as well. In Dmytruk's view, the prohibition on contact was unconnected with working for Vinmar, and thus as long as he did not take the initial step to contact Lacayo, he could not be in violation of the injunction. In Ravago's view, "[t]he question . . . is not who took the initial step to communicate, but rather who took the initial step to communicate about working for Vinmar."

Assuming, *arguendo*, that the phrase "to work for Vinmar" applies only to the verb "solicit," Dmytruk was nevertheless forbidden to (take the

No. 19-20800

initial step to) "contact, try to contact, or solicit" Ravago employees. Thus, even if Dmytruk did not violate the prohibition on taking the initial step to contact Ravago employees, he was still subject to the prohibition on taking the initial step to solicit Ravago employees to work for Vinmar. Nothing in the injunction's language supports Dmytruk's contention that if a Ravago employee first contacted him, he would then be free to solicit that employee.

Dmytruk points to the Connecticut court's explanation of the injunction but that militates against his position. The Connecticut court said that the "initial step" language was meant to allow Dmytruk to respond to a Ravago employee who is "searching for a job." This does not amount to Dmytruk being free to solicit any Ravago employee who approached him on matters unrelated to employment. That exception would have the unreasonable effect of swallowing the rule, leaving Dmytruk free to solicit Ravago employees under a host of uncontemplated circumstances.[3] We conclude that, in relevant part, paragraph four of the injunction was clearly meant to keep Dmytruk from taking the initial step to solicit Ravago employees on Vinmar's behalf.

---

[3] Dmytruk points us in the direction of *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10–11 (1st Cir. 2013), in support of the proposition that the initial step language should be allowed to operate "with full force." The First Circuit in that case was merely elaborating on the distinction between active solicitation and accepting business. Importantly, it declined to adopt a per se rule on the weight of an initial contact, hesitating to accept an interpretation of initial contact that would deprive the employer of its bargained-for-protection. *Id*. at 11. Dmytruk's position is similar to the one the First Circuit disapproved of in *Harnett*, noting that "[t]he defendants [sought] to change the trajectory of the debate by insisting that, once a customer initiates contact with an employee who has switched his affiliation, all bets are off and subsequent business activity cannot as a matter of law constitute solicitation. This argument is simply a linguistic trick: creative relabeling, without more, is insufficient to transform what is manifestly a question of fact into a question of law." *Id*. at 10–11.

### ii.   *Evidence Supporting the Findings*

With this interpretation in mind, we turn to whether the district court's contempt findings are supported by the record.

"To establish civil contempt, the [movant] must prove by clear and convincing evidence that a party violated 'a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.'" *Sundown Energy*, 773 F.3d at 615 (quoting *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995)). Evidence in this context amounts to being clear and convincing if it "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established . . . ." *See Test Masters*, 799 F.3d at 456 (quoting *Oaks of Mid City Resident Council v. Sebelius*, 723 F.3d 581, 585 (5th Cir. 2013)).

Certainly, "[i]f the district court's factual findings are insufficient to allow this [c]ourt to review the judgment below, then we must vacate the judgment and remand for more detailed findings." *Colonial Penn Ins. v. Mkt. Planners Ins. Agency*, 157 F.3d 1032, 1037 (5th Cir. 1998). And it is "an abuse of discretion" for a district court to "refus[e] to identify the basis for its contempt finding." *In re U.S. Bureau of Prisons, Dep't of Justice*, 918 F.3d 431, 440 (5th Cir. 2019). But this is not the case here. At the contempt hearing, the district court plainly found that Dmytruk "raised the prospect of employment with Vinmar," and the court stated that "that's all it takes." Although the court did not specifically recite that Dmytruk "took the initial step," it did find that Dmytruk, not Lacayo, "raised the prospect" of employment. This amounts to the same thing. The district court's language provides "a clear understanding of the analytical process by which [the] ultimate findings were reached," *ENI US Operating Co. v. Transocean*

*Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 935 (5th Cir. 2019), and thus we need not remand the case for additional factfinding.

As to the evidence itself, Dmytruk argues that the district court erred by disregarding unrebutted testimony from Vinmar employee Raul Diaz, alleging that Diaz discussed Vinmar employment with Lacayo before the conversation between Lacayo and Dmytruk took place. Ravago responds that the district court could have disbelieved Diaz even if his testimony was unrebutted and further argues that because there is no evidence that Dmytruk knew about Diaz's conversation with Lacayo, Dmytruk remained bound by the injunction.

Lacayo testified to having received a phone call from Dmytruk and also that Dmytruk enticed him to consider the prospect of working for Vinmar. Diaz testified to an interaction with Lacayo earlier in the day. Diaz's testimony, however, was not so clear and unimpeachable that the district court was required to find that Diaz had in fact solicited Lacayo. Lacayo's account of the events contradicted Diaz's. Even if Lacayo did not directly rebut some of Diaz's points, a court need not accept as true all testimony that is not directly rebutted. Diaz stated he was employed by Vinmar, Dmytruk's employer and codefendant, after all. *See, e.g., Brown v. Ford Motor Co.*, 479 F.2d 521, 523 (1973) ("When the interest of the testifying witness in a particular outcome of the pending litigation is substantial, his possible bias may be sufficient in itself to create a jury question as to credibility.").[4]

---

[4] Further, the record is clear that the district court did not simply ignore this testimony. Rather the court concluded that the interaction did not amount to "seeking out anybody or looking for a job," because "[t]hat's what you do at trade shows is wander around and talk to other people." Even if the district court found there was contact between Diaz and Lacayo before the exchange between Dmytruk and Lacayo at the restaurant, this does not necessarily preclude a finding that Dmytruk was the first to take the initial step to solicit Lacayo.

In the end, Diaz's direct testimony was simply that, after he met Lacayo and gave him his business card, Lacayo said, "Vinmar is a good company." Diaz responded: "If in the future you are interested or so, you can contact me as a courtesy." That was the extent of their interaction. It would not have been clearly erroneous for the district court to conclude that this did not constitute Diaz taking the initial step to solicit Lacayo—either because Diaz's vague statement did not constitute solicitation or because Lacayo himself took the initial step in that exchange by praising Vinmar.

In reaching its determination that Dmytruk violated the injunction, the district court considered conflicting testimony, but it also considered evidence corroborating the witnesses' accounts. Different witnesses provided different explanations for phone records and missing text messages. Evidence of the location at which the solicitation allegedly took place, the acoustics, and ambiance also informed the district court's decisions as to which account of the facts it found most credible. The district court could have found, by clear and convincing evidence, that Dmytruk violated the injunction's unambiguous prohibition. We therefore affirm the district court's findings and its award of attorneys' fees—which everyone agrees is a compensatory, civil sanction.

### D. Recordkeeping Requirement & Three-Month Extension

At this appeal's inception the parties disputed whether the district court's imposition of an additional recordkeeping requirement and a three-month extension of the underlying injunction could survive review. Subsequently, Dmytruk filed a Rule 28(j) notice with this court, informing us that because these expired, the issues are moot and need not be addressed. Dmytruk then filed a second letter asserting that his "challenge to the

No. 19-20800

recordkeeping requirement remains a live controversy because the order that he turn over those records to Ravago derives from the unlawful recordkeeping mandate." Dmytruk conceded during oral argument that the recordkeeping requirement expired. By separate order, the district court directed the records be turned over to the court. These were due on July 16, 2020, and there is no indication that Dmytruk failed to comply with the court's directive. Now that the district court is presumably in possession of Dmytruk's log, it is unclear what relief vacating the recordkeeping requirement might provide. Accordingly, Dmytruk's arguments on appeal as to these sanctions are dismissed as moot.

## CONCLUSION

For the reasons detailed above, part of this appeal (concerning the recordkeeping requirement and the extension of the injunction) is DISMISSED as moot. The $50,000 sanction is VACATED. The balance of the district court's order is AFFIRMED. Each party shall bear its own costs.